UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVON DAVIES,<br><br>    Plaintiff,<br><br>  v.<br><br>M. DELAVEGA, et al.,<br><br>    Defendants. | No. 2:14-cv-2831 MCE CKD P<br><br>ORDER AND<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a California prisoner proceeding pro se with an action for violation of civil rights under 42 U.S.C. § 1983. Two matters are before the court.

I. Screening

On March 8, 2016, the court screened plaintiff's third amended complaint as the court is required to do under 28 U.S.C. § 1915A. The court found that plaintiff's complaint stated a claim upon which plaintiff could proceed under the Eighth Amendment against defendant Crosson. Since plaintiff had consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c), the court dismissed all other defendants and claims.

In <u>Williams v. King,</u> 875 F.3d 500, 503-04 (9th Cir. 2017) the Ninth Circuit found magistrate judges do not have authority to dismiss any named-defendant from a case unless that defendant has consented to magistrate judge jurisdiction, even if, as in this case, the defendant has not been served with process, nor been screened in pursuant to 28 U.S.C. § 1915A(a). In light of

Williams, the court will vacate its order dismissing all defendants other than defendant Crosson, and instead recommend that all defendants other than defendant Crosson and all claims other than a claim arising under the Eighth Amendment against defendant Crosson be dismissed.

Generally speaking, plaintiff alleges that the fact that he did not receive any treatment for what plaintiff describes as a fungal infection of the eyes amounts to cruel and unusual punishment in violation of the Eighth Amendment. At all times relevant, plaintiff was permitted access to defendant Crosson, a board-certified ophthalmologist, and there is nothing in plaintiff's complaint suggesting any defendant knew defendant Crosson either did not, would not or was not capable of providing plaintiff constitutionally adequate treatment. This being the case, plaintiff fails to state a claim upon which relief can be granted against any defendant other than defendant Crosson. Also, plaintiff asserts some claims arising under California law. However, he has not pled compliance with the California Tort Claims Act, which he must do to proceed on claims arising under California law in this court. State v. Superior Court, 32 Cal. 4th, 1234, 1239 (2004).

II. Motion for Summary Judgment

As indicated above, plaintiff's remaining claim is against defendant Dr. Charles Crosson, an ophthalmologist. Plaintiff asserts treatment provided by Dr. Crosson at California State Prison, Solano (CSP Solano) amounts to cruel and unusual punishment in violation of the Eighth Amendment. Defendant Crosson's motion for summary judgment is before the court.

A. Allegations Relevant to Plaintiff's Remaining Claim

In his third amended complaint, plaintiff alleges defendant Crosson subjected plaintiff to cruel and unusual punishment by denying plaintiff's "request for specialized medical care." ECF No. 36 at 23. Plaintiff suffered various symptoms as the result of what he believes is a fungal infection in his eyes. Plaintiff asserts treatment for such an infection, which was not provided by defendant, "may range from application of anti-fungal drugs to a combination of anti-fungal agents and surgery, including aspiration of the vitreous fluid within the eye." ECF No. 36 at 5. Plaintiff alleges defendant, in lieu of providing treatment for plaintiff's alleged fungal infection, could have referred plaintiff to a specialist.

/////

Plaintiff asserts defendant's failure to treat plaintiff's fungal infection or refer plaintiff to a specialist in fungal infections of the eye has resulted in injury for which plaintiff should be compensated. ECF No. 36 at 3.

### B. Medical Care Under the Eighth Amendment

Denial of medical care for a prisoner's serious medical needs may constitute a violation of the prisoner's Eighth Amendment rights. Estelle, 429 U.S. at 104-05 (1976). A prison official commits such a violation only when the official is deliberately indifferent to a prisoner's serious medical needs. Id. A "serious medical need" exists when "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) citing Estelle, 429 U.S. at 104. Deliberate indifference is established by (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Jett, 439 F.3d at 1096.

A showing of merely negligent medical care is not enough to establish a constitutional violation. Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-106. A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

### C. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or show that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

4

obligation to produce a factual predicate from which the inference may be drawn. See <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

D. <u>Arguments and Analysis</u>

Defendant argues that there is no genuine issue of material fact as to whether defendant was at least deliberately indifferent to plaintiff's eye issues. Considering: 1) the extensive care plaintiff received from defendant, a second ophthalmologist to whom plaintiff was referred by defendant and other medical professionals; and 2) plaintiff has failed to put forth any admissible evidence indicating he has a fungal infection in either eye, the court agrees.

In his affidavit, defendant Crosson asserts as follows:

> I am familiar with Plaintiff Avon Davies through multiple interactions with and examinations of him during his incarceration at Solano. I know from my examinations of Mr. Davies that he is highly nearsighted in each eye and reports to have worn glasses since childhood. He also has amblyopia, sometimes called lazy eye, in his right eye. It is a condition that prevents that lazy eye from seeing as clearly as the other eye. Because this condition was not fully corrected in early childhood, it has become permanent and cannot be treated.
>
> According to a medical record prepared by a Solano optometrist, Dr. Atwal, on October 18, 2013, Mr. Davies complained of a floater in his eye but said it did not look like a normal floater. Floaters are spots in vision, which may look like black or grey specks, strings, or cobwebs that drift around in the field of vision. Most floaters are caused by age-related changes that occur as the jelly-like substance (vitreous) inside of your eyes becomes more liquid. The likelihood of floaters is also increased in nearsighted people.
>
> According to Dr. Atwal's notes, he evaluated Mr. Davies and found no obvious signs of a foreign body in the eye. He determined Mr. Davies to have either an ocular migraine or vitreous floater. Dr. Atwal did not see any holes, tears, or breaks in Mr. Davies's eyes, which would signify an urgent situation with potential for loss of eyesight. As Mr. Davies's condition was not urgent or emergent, Dr. Atwal recommended that he follow up with the ophthalmologist (me) in one to two weeks.

/////

I examined Mr. Davies in connection with his complaint of a floater or object in his vision in his left eye on October 30, 2013, and I determined that his visual acuity had not decreased and was the same as I recorded on his exam in February 2012. My diagnosis of Mr. Davies on October 30, 2013, was that he had posterior vitreous detachments in both eyes, asymptomatic in the right and with a symptomatic floater in the left eye.

Rarely a posterior vitreous detachment can cause a retinal detachment, but Mr. Davies's retina was fully attached with no retinal tears. Vitreous detachment is a common occurrence mainly in patients fifty years of age or older. It is also more prevalent in patients with high myopia (nearsightedness). Mr. Davies was sixty-three years old at the time of the October 2013 exam with high myopia. Vitreous detachment can bring annoying floaters into the patient's field of vision but the floaters gradually clear over time. Though the floaters can be annoying for months until they settle out of the central vision, a vitreous detachment without retinal detachment does not threaten sight. Therefore, the standard of care is that posterior vitreous detachment can be managed without medical intervention. An ophthalmologist should explain his findings to the patient and advise the patient to return immediately if any signs of retinal tears or detachment occur. I complied with this standard and requested to see Mr. Davies again in one year for follow-up.

At no point during the October 30, 2013 examination or any other examination of Mr. Davies have I detected a fungal infection in his eye. Based on Mr. Davies's records, neither Dr. Tesluk nor Dr. Atwal detected any fungal or other infection in Mr. Davies's eyes. Symptoms of a fungal infection include blurred vision and pain that without treatment would inexorably worsen, resulting ultimately in a blind, painful eye, and the infection would probably spread to the surrounding tissues. If not put on treatment for a fungal infection, a patient would lose not only an eye but also other body parts. Mr. Davies's medical records do not support the presence of a fungal infection anywhere in his body.

Fungal infections arise from one of two routes. One route is by introducing fungus into the eye through a direct, penetrating injury to the eyeball. The second route is when it comes from a fungal infection elsewhere in the body (primary site) and is then carried by the bloodstream to the eye. This results in a fungal infection in the eye with white-ish, creamycolored visible microabscesses in the back of the eye, which then spread internally to the retina and vitreous. Signs include the white lesions in the retina-choroid and inflammatory cells in the vitreous. These signs would be detectable during an eye examination. Mr. Davies had no signs of a fungal infection present in his eyes.

According to his medical records, Mr. Davies continued to complain to his primary care provider, Dr. Sweeney, about a microorganism in his eye and vision changes. In response to one complaint on November 7, 2013, Dr. Sweeney, requested tests for stool ova and parasites. The test results were negative.

According to his medical records, on January 14, 2014, Mr. Davies reported a sudden loss of peripheral vision in his right eye to medical staff in Solano's Triage and Treatment Area (TTA). TTA staff referred Mr. Davies to San Joaquin General Hospital for evaluation. The records from San Joaquin General Hospital show that Mr. Davies was discharged the same day without seeing an ophthalmologist. His CT scan and stroke panel results were negative.

I next saw Mr. Davies on February 27, 2014, however, he refused an examination and stated that he did not believe the appointment was necessary.

According to his medical records, Mr. Davies saw Registered Nurse Carlson on March 27, 2014, and complained about a fungus in both of his eyes. He denied pain at the time. Nurse Carlson noted "Anxiety aeb multiple requests to see eye doctor." "Aeb" is a medical abbreviation for "as evidenced by." She found no obvious abnormalities affecting Mr. Davies's eyes.

In June 2014, I referred Mr. Davies to another ophthalmologist, Dr. Tesluk, for a second opinion. I made the referral because Mr. Davies had again refused medical services after I confirmed my original diagnosis that he had a vitreous detachment and not a fungal infection. I have reviewed Dr. Tesluk's letter regarding his June 30, 2014 examination of Mr. Davies and see that he also diagnosed Mr. Davies with a vitreous detachment in his left eye and no sign of fungal infection.

On July 30, 2014, I followed up with Mr. Davies about his visit with Dr. Tesluk. Mr. Davies was frustrated with Dr. Tesluk's diagnosis that he had a vitreous detachment and did not have a fungal infection. Mr. Davies complained he was experiencing pain, which I told him could be caused by migraines. I recommended that Mr. Davies's primary care doctor consider a trial with anti-migraine medicine. Because some of my examination equipment was not working that day, I recommended that we continue the appointment in two weeks. Mr. Davies stated he would refuse the appointment.

On February 22, 2015, Mr. Davies reported to Solano's TTA complaining of left eye pain and bleeding. According to the TTA records, Mr. Davies was sitting comfortably during the visit without grimacing. This behavior was inconsistent with his complaints of pain. A progress note from Dr. Sweeney the next day indicates that he detected left eye subconjunctival hemorrhage and vision changes in Mr. Davies. Subconjunctival hemorrhaging is a common and benign condition that occurs when small blood vessels in the eye leak and bleed into the area between the white part of the eye and the transparent coating of the eye. It may be caused by sudden or severe pressure such as a sneeze or cough, heavy lifting, vomiting, straining due to constipation, or rubbing one's eyes too roughly. Its appearance may be alarming but it is generally painless and harmless. Subconjunctival hemorrhaging will clear on its own and no treatment is required.

> I next saw Mr. Davies on March 18, 2015, where he again refused an examination. I was able to observe that his subconjunctival hemorrhage had significantly cleared, as expected.
>
> On September 16, 2015, Mr. Davies returned to the clinic and complained of twitching in his right eyelid and pain in his left eye. I attempted to explain the quivering to Mr. Davies, but he disagreed with me and I could tell we had lost rapport. I offered to refer Mr. Davies to another eye physician and notified Dr. Sweeney of my recommendation.
>
> On September 28, 2015, Dr. Tesluk examined Mr. Davies for a second time. According to a letter of the same date, Dr. Tesluk concluded again that Mr. Davies had a vitreous detachment in his left eye and that no treatment was necessary. He also found that Mr. Davies had no ophthalmological condition that could be causing eye pain. Dr. Tesluk did not recommend that Mr. Davies be provided with pain medication for his eyes and recommended a follow-up visit in one year.
>
> On June 29, 2016, Mr. Davies refused medical services from me again.

As indicated in defendant's affidavit, defendant referred plaintiff to Dr. Tesluk on two occasions. In his affidavit, Dr. Tesluk indicates as follows:

> Since 1995, I have served as the Medical Director of the Modesto Surgery Center. As Medical Director, I am responsible for activities related to the delivery of medical care including quality assurance, cost management, and medical protocol development.
>
> In addition to my responsibilities as Medical Director, I perform routine examinations to detect, diagnose, and manage patients' eye conditions and diseases. I also perform cataract/implant surgery, retina surgery, refractive surgery, and ocuplastic surgery.
>
> I am familiar with Mr. Avon Davies through my work as an ophthalmologist. I first examined Mr. Davies on June 30, 2014 at the Modesto Surgery Center, following a referral from Dr. Crosson. It was my understanding from the brief description included with the referral that Mr. Davies was experiencing eye pain and believed he had an infection. I did not receive information about how Dr. Crosson or anyone else had diagnosed Mr. Davies. I spoke with Mr. Davies about his symptoms and he stated a belief about having some type of fungal pathology and objects in his eyes. I conducted an examination, which revealed he had poor vision in his right eye from myopic amblyopia. Further examination showed he had a vitreous detachment in his left eye, but no presence of retinal tears. Though the floaters caused by a vitreous detachment can be an annoyance, vitreous detachments occur commonly with age and the standard of care does not require medical intervention. Symptoms typically disappear on their own over time. Mr. Davies also has

> drooping in his right eyelid. It occurs with age and does not require medical intervention.
>
> In addition to his concern about a fungal infection, Mr. Davies complained of eye pain. However, at no time during the examination or our conversation did Mr. Davies's facial expressions or mannerisms suggest that he was in pain. Besides stating that he was in pain, Mr. Davies exhibited no other pain indicators. Lack of reactive pain indicators signals that a patient might not be suffering the pain he claims to be.
>
> Mr. Davies exhibited no signs of any infection. If Mr. Davies had a fungal infection he would have had redness and pain. As mentioned above, Mr. Davies lacked indicators of pain during the examination. Mr. Davies also would have had opacification of the cornea (white-ish patches), or inflammation in the anterior or vitreous chambers, which would look like cellular debris floating on the eye, if he had a fungal infection. Each of these symptoms would have been visible in the examination.
>
> I saw Mr. Davies again on September 28, 2015. Mr. Davies continued to complain of eye pain and a fungal infection. I conducted another examination, which again showed the myopic amblyopia in his right eye, and a vitreous opacity in the left eye from the vitreous detachment. He had no ophthalmic condition that could be causing his eye pain. Accordingly, I did not recommend that Mr. Davies be provided any pain medication for his eye. This examination of Mr. Davies revealed none of the symptoms that would be present if he had a fungal infection.
>
> Based on my education, experience, training, and examinations of Mr. Davies, it is my professional opinion that there is no evidence to support his claim of a fungal infection or any other infection of the eye. It is also my professional opinion that the examination, diagnosis, and treatment plan Mr. Davies received for his eye concerns were within the ophthalmological standard of care.

The court notes that plaintiff disputes certain parts of defendant and Dr. Tesluk's affidavits and the court construes all of the evidence in the light most favorable to plaintiff. However, what is not disputed is that defendant never refused to see plaintiff, never interfered with treatment provided by others and referred plaintiff for second opinions on two occasions. It is also not disputed that Dr. Tesluk agrees with defendant that plaintiff did not suffer from a fungal infection, and plaintiff fails to point to any admissible evidence suggesting that he did or does. Finally, there is no evidence suggesting defendant's failure to treat plaintiff's eye condition as a fungal infection caused plaintiff any harm.

////

9

After reviewing all of the evidence before the court, there is no genuine issue of material fact as to whether defendant's treatment of plaintiff eyes issues amount to cruel and unusual punishment as there is no genuine issue of material fact as to whether defendant was deliberately indifferent to plaintiff's serious medical needs

Plaintiff also alleges neither defendant nor Dr. Tesluk had the necessary expertise to diagnosis or treat plaintiff's fungal infection. In their affidavits, both defendant and Dr. Tesluk indicate they are board certified in ophthalmology. Defendant has been certified since 1981, and Dr. Tesluk since 1987. There is nothing admissible before the court suggesting these facts do not render defendant and Dr. Tesluk qualified to treat eye infections.

E. Conclusion

For all the foregoing reasons, the court will recommend that defendant Crosson's motion for summary judgment be granted, and he be dismissed from this action.[1]

In accordance with the above, IT IS HEREBY ORDERED that the court's March 8, 2016 order that all defendants other than defendant Crosson be dismissed is vacated.

IT IS HEREBY RECOMMENDED that:

1. All defendants and claims other than a claim arising under the Eighth Amendment against defendant Crosson be dismissed pursuant to 28 U.S.C. § 1915A.

2. Defendant Crosson's motion for summary judgment (ECF No. 73) be granted;

3. Defendant Crosson be dismissed from this action; and

4. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned

---

[1] As argued by defendant, defendant is also entitled to summary judgment based upon the "qualified immunity" doctrine because there is no genuine issue of material fact as to whether defendant Crosson violated clearly established statutory or Constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 12, 2018

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
davi2831.msj